United States District Court
Southern District of Texas
**ENTERED**
October 19, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRYANT CHRISTOPHER WATTS, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-2776 |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner, a state inmate proceeding *pro se*, filed a habeas petition under 28 U.S.C. § 2254 challenging his state court conviction for murder. Respondent filed a motion to dismiss (Docket Entry No. 11) with a copy of the state court record (Docket Entry No. 12), to which petitioner filed a response (Docket Entry No. 15).

Having considered the petition, the motion to dismiss, the response, the record, and the applicable law, the Court **GRANTS** the motion to dismiss and **DISMISSES** this lawsuit for the reasons shown below.

### I. BACKGROUND AND CLAIMS

A jury found petitioner guilty of murder on October 7, 2019, in Harris County, Texas, and assessed punishment for a fifty-year term of imprisonment. The conviction was affirmed on appeal, and discretionary review was refused on December 9, 2020. *Watts v. State*, No. 01-19-00804-CR, 2020 WL 6163832 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

Petitioner's application for state habeas relief, filed with the state trial court on December 7, 2021, was denied by the Texas Court of Criminal Appeals without a written order on May 18, 2022.

Petitioner timely filed the pending federal habeas petition on June 30, 2022, raising the following claims for relief:

1.   The evidence is insufficient to support the conviction.

2.   Appellate counsel was ineffective in failing to raise claims for

    a.   denial of an impartial jury;

    b.   confrontation violations;

    c.   a *Brady* violation;

    d.   prosecutorial misconduct; and

    e.   denial of an impartial trial judge.

3.   Appellate counsel failed to notify him that his petition for discretionary review was refused.

Respondent argues that petitioner's claims are partially unexhausted and procedurally defaulted, and that the exhausted claims have no merit.

## II.   FACTUAL BACKGROUND

The intermediate state court of appeals set forth the following statement of facts in its opinion affirming petitioner's conviction.

2

[Petitioner] and his brother, Arron [sic] Jones, worked at Vivid, a strip club, shining shoes. Mistie Bozant was a dancer at the club. The complainant, Phillip Panzica, known as "Flip," was Bozant's boyfriend.

On the night of March 18, 2016, Jones and Bozant agreed to hang out together after she finished work. [Petitioner] arrived at the club around 10:30 p.m. Panzica arrived sometime later.

Panzica, Bozant, Jones, and [petitioner] eventually left the club together to go to a party at a Marriott hotel. Panzica drove Bozant's car, Bozant sat in the passenger seat, Jones sat in the rear passenger seat, and [petitioner] sat behind Panzica. When it became clear that they would not be allowed into the party at the hotel, Panzica suggested that the group go to the Star Lounge.

As Panzica was turning left off of Westheimer Road, [petitioner] shot him several times. [Petitioner] dragged Panzica from the car, left him in the middle of the intersection, and told Bozant to get out of the car. [Petitioner] got in the driver's seat, Jones climbed into the passenger seat, and they sped away. A metro bus driver stopped to render aid to Panzica while one of the passengers called 911. Panzica was later pronounced dead at the scene.

Former Houston Police Department (HPD) Homicide Detective Brian Harris was assigned to the case. Upon arriving at the scene, he saw a body in the middle of the intersection and at least three shell casings and a knife approximately six to eight inches long near the body. Detective Harris took a written statement from Bozant. Bozant identified Panzica as her fiancé and told Detective Harris that the assailants had stolen her car.

On March 19, 2016, Menard County Deputy Sheriff William Burl Hagler was on patrol when he observed a black vehicle speeding over a bridge. When the deputy attempted to initiate a traffic stop, the driver sped up and a high-speed [sic] ensued into the next county. The car eventually crashed into a barbeque restaurant in Eola, a small town near San Angelo, injuring an elderly couple. [Petitioner] and Jones emerged from the car, and Deputy Hagler took them into custody for evading arrest.

Officers placed [petitioner] and Jones in separate patrol cars to transport them to Menard County jail. On the way there, [petitioner] told Deputy Hagler that a guy named Flip and a girl had tried to rob him. [Petitioner] said that Flip was

3

armed and that he had to shoot Flip when he went for his weapon. The dash cam video from the back seat of Deputy Hagler's patrol car was played for the jury.

Detective Harris arrived in Menard County that evening and interviewed [petitioner]. The video of the interview was shown to the jury. During the interview, [petitioner] told Detective Harris that Flip was acting suspicious and driving in the wrong direction, and that [petitioner] became intimidated. [Petitioner] told Detective Harris that he thought Flip was armed and that [petitioner] shot him when Flip dropped his hands. Detective Harris testified that the investigation uncovered no evidence that Panzica had a gun.

Detective Harris's partner showed two photo arrays to Bozant—one which included a photo of Jones and the other which included a photo of [petitioner]. Bozant picked out Jones and [petitioner] from the arrays and identified [petitioner] as the "shooting man."

Joel Timms, a Texas Ranger with the Department of Public Safety, took photographs and collected evidence from the vehicle. Timms testified that the deputies involved in the high-speed pursuit said they saw something come out of [petitioner's] vehicle several miles before the crash. After two days searching the area, officers recovered a firearm—a Taurus Millennium .45—approximately a half-mile from the crash site. The evidence collected from the vehicle included several articles of clothing, a backpack with four live .45 cartridges, an empty cartridge from the car's floorboard, and Bozant's purse containing approximately $1,500 dollars in cash. Timms also took DNA swabs from bloodstains found inside the vehicle.

Jones, [petitioner's] brother, testified that he met Panzica about two weeks after Jones began working at the club. On the night in question, Bozant agreed to hang out with Jones and [petitioner], and Panzica joined them. Jones testified that Panzica offered methamphetamine to [petitioner], but [petitioner] told Panzica "not to come at [me] like that" because [he] does not do those types of drugs. Jones testified that Panzica was apologetic, and [petitioner] and Panzica were "okay" afterwards.

Jones testified that when the plan to go to the party at a Marriott hotel fell through, [petitioner] told Panzica that if they were not going to the party, Panzica could drop [petitioner] and Jones off and they could go home. Panzica

4

suggested they go to the Star Lounge instead.  [Petitioner] responded that he did not know how he could get into the lounge because he was carrying a weapon.  Panzica told [him] not to worry because he went there all the time with his gun, and they let him enter.

Jones testified that [petitioner] asked to get out of the car at least three or four times.  Jones testified that Panzica began to turn around in his seat as he came to a stop in the middle of the intersection when [petitioner] shot him. [Petitioner] told Bozant to get out of the car several times, but she did not move.  Jones then told Bozant "please get out of the car so the same doesn't happen to you," and Bozant got out.  Jones climbed into the front passenger seat and they drove away.

Harrison Obaski, a Metro bus driver, saw a car speed away and a woman crying for help.  When Obaski stopped the bus, he saw a body in the middle of the road and the woman told him, "help me, they shot my boyfriend."  Obaski testified that when he asked her what happened, "she said . . . they were in the vehicle and they were having a[n] argument and they shot him from the back and threw him from the vehicle."

Kimberly Zeller, a firearms examiner with the Houston Forensic Science Center, testified that she examined a .45 firearm, two fired jacketed bullets, three fired cartridge cases, unfired ammunition, and a magazine to determine whether the fired bullets and cartridge cases were fired from the .45.  Zeller compared the fired bullets and fired cartridge cases to her test fires from the .45 and concluded that they were fired from the .45.

Dr. Roger Milton, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that Panzica sustained twelve gunshot wounds—six to the right upper shoulder and neck area and six to his left hand—and that four bullets were recovered from his body.  Dr. Milton testified that Panzica's toxicology results were positive for amphetamine, benzoylecgonine (a metabolite of cocaine), and methamphetamine.  He further testified that methamphetamine and cocaine are powerful stimulants that affect behavior.

Justin McGee, an HPD crime scene investigator, took photographs of the evidence found at the scene.  McGee testified that a knife was found close to Panzica's body as well as a holster attached to the left side of his waist.  The

button on the holster was unfastened.  McGee testified that Panzica could have unfastened the button, or it could have become unfastened when [petitioner] dragged Panzica onto the street.

The jury found [petitioner[ guilty of murder as charged.   During the punishment phase, [petitioner] pleaded true to two felony enhancement allegations of aggravated assault and bribery.  Finding the enhancements true, the jury assessed [petitioner's] punishment at fifty years' confinement.

*Watts*, at *1–2 (footnote and exhibit references omitted).

### III.  LEGAL STANDARDS

This petition is governed by provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court of the United States, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent.  *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

However, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.*, at 102–103 (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31. This presumption of correctness extends not only to express factual findings, but also to implicit or unarticulated findings which are necessary to the state court's conclusions of mixed law and fact. *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018).

The question for federal habeas review is not whether the state court decision was incorrect, but whether it was unreasonable, which is a substantially higher threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Federal courts look to the last reasoned opinion as the state court's decision. *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

## IV.   NON-EXHAUSTION AND PROCEDURAL DEFAULT

Respondent correctly argues that three of petitioner's claims for ineffective assistance of appellate counsel were not raised on collateral review, are unexhausted, procedurally defaulted, and barred from consideration by this Court. Specifically, respondent states that petitioner did not exhaust his claims that counsel failed to raise a *Brady* claim, a prosecutorial misconduct claim, and a claim for denial of an impartial judge.

Exhaustion requires that a habeas petitioner first fairly present the substance of his federal claims to the highest state court either through direct appeal or by state collateral review procedures. *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). In order to satisfy this requirement, a federal court claim must be the substantial equivalent of one presented to the state courts. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). It is not enough that "all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state law

claim was made." *Wilder*, 274 F.3d at 259. If a petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement. *Id.*

Although petitioner in this case presented ineffective assistance of counsel claims in his supplemental application for state habeas relief, he did not raise ineffective assistance of appellate counsel claims predicated on counsel's failure to raise a *Brady* claim, a prosecutorial misconduct claim, and a claim for denial of an impartial judge. Consequently, the claims are unexhausted, procedurally defaulted, and barred from consideration by this Court. *See Wilder*, 274 F.3d at 259; 28 U.S.C. § 2254(b). Petitioner does not dispute in his response that the three claims are unexhausted.

To overcome his procedural default, petitioner must demonstrate either cause and prejudice for his default, or that a fundamental miscarriage of justice will result from this Court's refusal to consider the claims. *Fearance v. Scott*, 56 F.3d 642 (5th Cir. 1995). Petitioner does not argue, much less demonstrate, cause and prejudice for his default or that a fundamental miscarriage of justice will result if his claims are not addressed.

Respondent is entitled to dismissal of petitioner's unexhausted claims for ineffective assistance of appellate counsel predicated on counsel's failure to raise a *Brady* claim, a prosecutorial misconduct claim, and a claim for denial of an impartial judge.

## V.  SUFFICIENCY OF THE EVIDENCE

Petitioner argues that the evidence is insufficient to support his conviction because (1) the prosecution did not establish that he intentionally or knowingly caused Panzica's death, and (2) the prosecution did not sufficiently rebut his self-defense theory.

Petitioner challenged the sufficiency of the evidence on direct appeal, arguing that the State failed to prove that he committed murder beyond a reasonable doubt or rebut his claim of self-defense.  In rejecting these arguments, the intermediate state court of appeals ruled as follows:

> We review appellant's challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979).  We examine all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged.
>
> The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit.  In a sufficiency review, we must consider the "combined and cumulative force" of the circumstances pointing toward guilt.  We may not substitute our judgment for that of the jury by re-evaluating the weight and credibility of the evidence.  An appellate court presumes that the fact finder resolved any conflicting inferences in favor of the verdict and defers to that resolution.
>
> In two points of error, appellant contends that the evidence is insufficient to support his conviction because the State failed to (1) prove that he committed

murder beyond a reasonable doubt and (2) rebut the defense of self-defense beyond a reasonable doubt.

As charged here, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Knowledge and intent are almost always proven by circumstantial evidence and may be inferred from the person's acts, words, and conduct, as well as the surrounding circumstances. A jury may infer specific intent to kill from use of a deadly weapon in a deadly manner unless it is reasonably apparent that death or serious injury could not result from the use of the weapon. Further, if a deadly weapon is fired at close range and death results, the law presumes an intent to kill. A firearm is a deadly weapon.

We start with the uncontroverted evidence that appellant used a deadly weapon and fired at Panzica who was seated in front of him in the car, resulting in Panzica's death. Jones testified that appellant began shooting Panzica when Panzica stopped the car. The jury heard testimony that Bozant identified appellant from a photo array and told the officer that appellant was the "shooting man." After appellant and Jones were taken into custody in Eola, appellant told Deputy Hagler that he had to shoot Flip when he went for his weapon. During his interview, appellant told Detective Harris that he shot Flip when Flip dropped his hands. The jury heard testimony that Panzica died from multiple gunshot wounds, a number of which were fired from only inches away. This evidence alone is sufficient for the jury to have reasonably found that appellant had the specific intent to kill Panzica.

The jury could also infer appellant's intent from his actions following the murder. The evidence showed that appellant fled the scene in Bozant's car and drove more than three hundred miles into central Texas where he led officers on a high-speed chase for more than forty miles. A fact finder may draw an inference of guilt from the circumstance of flight. The evidence also showed that appellant made efforts to conceal the murder weapon from law enforcement by throwing the firearm from the car during the pursuit. Attempts to conceal incriminating evidence is also a circumstance of guilt.

11

Viewing the evidence in the light most favorable to the verdict, we hold that the evidence was sufficient for a rational juror to find appellant guilty of murder as charged in the indictment beyond a reasonable doubt. We overrule appellant's first point of error.

Appellant also argues that the evidence is insufficient to support his conviction because the State failed to rebut the defense of self-defense beyond a reasonable doubt.

The Penal Code provides that deadly force used in self-defense is a defense to prosecution for murder if that use of force is "justified." Under [Texas Penal Code] section 9.32(a), a person is justified in using deadly force against another when and to the degree he reasonably believes the deadly force is immediately necessary to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. The Penal Code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." The law examines "reasonableness" from the perspective of an ordinary and prudent person.

Section 9.32(b), which establishes a presumption of reasonableness if three criteria are met, provides as follows:

The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor:

    (1)    knew or had reason to believe that the person against whom the deadly force was used . . . was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

    (2)    did not provoke the person against whom the force was used; and

    (3)    was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id.* § 9.32(b).

In evaluating a claim of insufficient evidence in the context of a justification defense, we apply the above general sufficiency review principles in conjunction with sufficiency review principles specific to justification defenses. When a defendant raises a claim of self-defense to justify the use of force or deadly force against another, "the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." The State, however, is not required to produce evidence; rather, its burden of persuasion only requires "that the State prove its case beyond a reasonable doubt." Thus, "[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's [evidence of a justification defense], but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the [justification]–defense issue beyond a reasonable doubt." Further, as with the general sufficiency principles, the trier of fact is the sole judge of the credibility of defensive evidence, and it is free to accept it or reject it. Ultimately, a justification defense is a fact issue that is determined by the jury, and "[a] jury verdict of guilty is an implicit finding rejecting the defendant's [justification]–defense theory."

The record reflects that the jury heard appellant's version of events, both through a videotape of his interview with the police and from other witnesses. The record reflects that the jury was fully informed of appellant's assertion that he shot Panzica in self-defense, out of fear for his safety or that of his brother. Appellant requested, and received, a self-defense instruction in the jury charge.

However, the jury also heard testimony from Obaski, the bus driver, who discovered Panzica's body in the middle of the intersection and performed CPR on him. Obaski testified that when he stopped the bus, Bozant said, "help me, they shot my boyfriend." Bozant told Obaski that "they were in the vehicle and they were having a[n] argument and they shot him from the back and threw him from the vehicle." Although appellant told the police that he thought Panzica was armed with a gun and was reaching for it when appellant shot him, the investigation found no gun on Panzica or any other evidence that he had one. The jury, as exclusive judge of the credibility of witnesses, was

free to believe or disbelieve appellant about Panzica's actions or to find that he was not reasonable in concluding that Panzica's actions justified deadly force.

Appellant argues that evidence that a knife was found near Panzica's body and that the holster was unfastened shows that Panzica was prepared to draw his weapon and, therefore, appellant was justified in using deadly force in self-defense. However, the jury also heard testimony from McGee, the crime scene investigator, that the knife could have come loose from the holster when appellant dragged Panzica onto the street. The jury is free to accept or reject defensive evidence on the issue of self-defense. Moreover, appellant's flight immediately after the shooting and his attempts to hide evidence suggest that appellant did not believe his actions were legally justified.

Based on all of the evidence presented at trial, viewed in the light most favorable to the verdict, we hold that a rational jury could have found the essential elements of the offense of murder beyond a reasonable doubt and also could have found against appellant on the self-defense issue. Appellant's second issue is overruled.

*Watts*, at *3–6 (citations omitted).

On federal habeas review of a state court conviction, a challenge to the legal sufficiency of the evidence is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), which reflects the federal constitutional due process standard. This standard requires a reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (citation omitted). The Supreme Court has emphasized "that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). Specifically,

14

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Coleman*, at 651 (citations, internal quotation marks omitted).  Thus, a federal habeas court questions whether the state court's assessment of the *Jackson* standard was unreasonable. *See* 28 U.S.C. § 2254(d)(1).

In light of the testimony and evidence presented at trial, and having considered the state appellate court's assessment of the *Jackson* standard, this Court finds that the state court's assessment was not unreasonable.  The State met its burden of proving beyond a reasonable doubt that petitioner committed murder.  The State further rebutted petitioner's defense of self-defense beyond a reasonable doubt.  Petitioner's reassertion of the arguments he made in state court and his disagreement with the state court's assessment and determination are insufficient to meet his burden of proof under AEDPA in this proceeding.

The state courts rejected petitioner's claims on direct appeal and on state collateral review.  Petitioner fails to show that the state court's determinations were contrary to, or involved an unreasonable application of, federal law or were unreasonable determinations of the facts based on the evidence in the record.  Respondent is entitled to dismissal of petitioner's claim challenging the sufficiency of the evidence to support his conviction.

## VI.   INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

A criminal defendant is constitutionally entitled to effective assistance of appellate counsel when he has a right to appeal under state law.  *Evitts v. Lucey*, 469 U.S. 387, 397 (1985); *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000).  Claims of ineffective assistance of appellate counsel are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013).

To obtain relief, a petitioner must demonstrate that his appellate counsel's conduct was objectively unreasonable and there is a reasonable probability that, but for counsel's deficient performance, the outcome of petitioner's appeal would have been different.  *See Smith*, 528 U.S. at 285; *Higgins v. Cain*, 720 F.3d 255, 260-61 (5th Cir. 2013).  To demonstrate deficiency, the petitioner must show that "counsel unreasonably failed to discover non-frivolous issues and to file a merits brief raising them." *Smith*, 528 U.S. at 285.  Counsel is not, however, required to "raise every non-frivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Id*. at 288.

Petitioner claims that appellate counsel was ineffective in the following three instances.

### A.   Right to Impartial Jury

Petitioner contends that counsel should have argued on appeal that he was denied an impartial jury.  Specifically, petitioner claims that his right to an impartial jury was violated

because he is an African American and the only African American person impaneled on his jury was an alternative juror who did not vote.

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). That is, "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Duren v. Missouri*, 439 U.S. 357, 363–64 (1979).   In *Duren*, the Supreme Court outlined the three factors required for establishing a prima facie violation of the Sixth Amendment's fair-cross-section requirements. "The defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to a systematic exclusion of the group in the jury selection process." *Id*. at 364.

Petitioner does not contest respondent's grounds for dismissal of this claim in his response.  Nevertheless, the Court has reviewed petitioner's federal habeas petition (Docket Entry No. 1) and notes that petitioner asserts in conclusory fashion that African Americans were "systematically excluded from serving on the jury" by "disproportionate exclusion." *Id*., p. 14.  He argues that, because African Americans constitute 22.6% of the population in Harris County, there should have been at least three African Americans sitting on his jury.

17

*Id.* In short, petitioner contends that African Americans were systematically excluded in the jury selection process in his case because only one African American juror heard his case.

Petitioner misapplies *Duren*. Petitioner's factual allegations arguably address the first ("distinctive group") and second ("under-representation") factors, but then conflate those two factors with the third ("systematic exclusion"), effectively abrogating the third *Duren* factor as a separate element. Adopting petitioner's interpretation of *Duren* would improperly negate petitioner's burden to show that under-representation in his case was due to systematic exclusion of African Americans. *See Berghuis v. Smith*, 559 U.S. 314, 333 (2010) (discussing that *Duren* first and foremost requires a habeas petitioner to show that the under-representation complained of was due to systematic exclusion). Moreover, *Duren* looks to the "representation of [the distinctive group] in venires from which juries are selected"; that is, it looks to composition of the venire panel and not to the empaneled jury itself. Petitioner presents no factual allegations regarding, and the record does not establish, the composition of the venire panel in this case or how it was selected.

Petitioner does not show that any under-representation of African Americans on his jury panel was due to systematic exclusion of African Americans in the jury selection process. Because he fails to show that he was denied an impartial jury, he does not demonstrate that, but for counsel's failure to raise the issue on appeal, the result of his appeal would have been different.

The state court denied habeas relief.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to dismissal of this claim.

B.     Confrontation Violation

Petitioner next claims that appellate counsel was ineffective in failing to challenge the murder conviction based on violations of his right to confront witnesses.  Specifically, he claims that out-of-court statements made by Bozant were improperly admitted through other witnesses at trial because Bozant did not appear at trial and he was never given the opportunity to confront or cross-examine her.  As correctly argued by respondent, petitioner's confrontation rights were not violated because the subject statements were not testimonial in nature.

The Sixth Amendment's Confrontation Clause provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  *Ohio v. Clark*, 576 U.S. 237, 243 (2015).  The Supreme Court has interpreted "witnesses" for purposes of the Confrontation Clause as those "who bear testimony."  *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 51 (2004)).  The Court further defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.*  The Court concluded that the Confrontation Clause "prohibits the introduction of testimonial statements by a non-testifying witness, unless the witness is

19

unavailable to testify, and the defendant had had a prior opportunity for cross-examination."
*Id.* (internal quotations omitted).

In addressing confrontation objections, courts are to apply a "primary purpose test" in determining whether a statement is testimonial. *See Clark* at 244–46. The "primary purpose test" holds that "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* at 245. In applying the primary purpose test, all relevant circumstances are to be considered, including but not limited to, whether there was an ongoing emergency at the time the out-of-court statements were made. *Id.* at 244–45. Statements made to individuals who are not law enforcement officers are much less likely to be testimonial. *Id.* at 246.

Petitioner complains that Detective Harris testified at trial that Panzica and/or Bozant had shared information with another individual regarding an event that happened in Las Vegas and to having a large sum of money. Harris testified in relevant part as follows:

HARRIS:     [Panzica] had shared about an incident that happened in Las Vegas and that he had appeared on a television show called Inside Edition and that he had a large sum of money with those people. They all agreed to go out – Mistie; Arron, AKA Shoeshine; Bryant; and Mistie – and they were going to go to a – I don't know if it was a soccer players' party – oh, auto racers' party.

4 RR 25. Reviewed in context of all relevant circumstances, it is clear that these statements were background information and not solemn declarations made for the primary purpose of

establishing or proving a fact. As the out-of-court statements were not testimonial in nature, they did not fall under the purview of the Confrontation Clause. *See Clark* at 243, 245. Petitioner does not show that, had appellate counsel raised a confrontation issue on direct appeal, the result of the appeal would have been different. Consequently, petitioner establishes neither deficient performance nor actual prejudice under *Strickland.*

Petitioner further asserts that Bozant's out-of-court statements to Obaski, the bus driver who stopped to help at the scene of the crime, were introduced at trial in violation of the Confrontation Clause. Obaski testified that Bozant said that her boyfriend had been shot and "that they were in the vehicle and they were having an argument and they shot him from the back and threw him from the vehicle." 5 RR 114–16. However, considered within context of all relevant circumstances, the primary purpose in making these statements was not testimonial—these statements were not solemn declarations made for the purpose of establishing or proving a fact. *See Clark*, 576 U.S. at 243, 245. Rather, these statements were in response to the ongoing emergency and were made to Obaski, who was rendering emergency aid to Panzica at the scene, and not to a law enforcement officer. *See id.* at 244–46.[1] Again, petitioner does not show that, had appellate counsel raised the confrontation issue on direct appeal, the result of the appeal would have been different. Petitioner establishes neither deficient performance nor actual prejudice under *Strickland.*

---

[1] It bears repeating that petitioner never denied shooting Panzica. To the contrary, petitioner's defense at trial had been that he shot Panzica in self-defense.

21

The state court denied habeas relief. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to dismissal of this claim.

C.    Failure to Notify

Petitioner claims that he received ineffective assistance of appellate counsel because counsel did not inform him that his petition for discretionary review had been refused. Petitioner argues that this delay impeded his ability to pursue his rights under 28 U.S.C. § 2254, and that he is entitled to equitable tolling of the AEDPA one-year statute of limitations.

Petitioner's claim lacks merit because his federal habeas petition in the instant case was timely filed. Moreover, respondent acknowledges that petitioner's petition was timely filed. Consequently, petitioner does not show that he was prejudiced under *Strickland* by any purported delay in counsel's notification of the state court's ruling.

The state court denied habeas relief. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to dismissal of this claim.

## VII.   CONCLUSION

Respondent's motion to dismiss (Docket Entry No. 11) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**.  Any and all other pending motions are **DENIED AS MOOT**.  A certificate of appealability is **DENIED**.

Signed at Houston, Texas, on this the  18th day of October, 2023.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE